BART M. DAVIS, IDAHO STATE BAR NO. 2696
UNITED STATES ATTORNEY
DARCI N. WARD, IDAHO STATE BAR NO. 8852
ASSISTANT UNITED STATES ATTORNEY
DISTRICT OF IDAHO
WASHINGTON GROUP PLAZA IV
800 EAST PARK BOULEVARD, SUITE 600
BOISE, ID 83712-7788
TELEPHONE: (208) 334-1211
FACSIMILE:  (208) 334-1413

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| In re the Matter of the Search of the Premises of Specialty Fulfillment Center (DBA AC Fillers), 3 17th St. S., Nampa, ID | Case No. 1:17-mj-9885-CWD<br><br>**GOVERNMENT'S RESPONSE TO NORDIC CLINICAL'S MOTION FOR RETURN OF PROPERTY PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 41(g)** |

The United States of America, by and through Bart M. Davis, United States Attorney, and the undersigned Assistant United States Attorney for the District of Idaho, hereby asks the Court to deny Nordic Clinical's Motion for Return of Property Pursuant to Federal Rule of Criminal Procedure 41(g).

### INTRODUCTION

In this action under Rule 41(g) of the Federal Rules of Criminal Procedure, the movant, Nordic Clinical, Inc. (hereafter, "Nordic") asks this court to return various drug products seized from Specialty Fulfillment Center (DBA AC Fillers), 3 17th St. S., Nampa, ID, during the execution of a lawful search warrant on September 26, 2017, claiming both that the seizure was improper, and that the drugs at issue are otherwise lawfully marketed products.  Because both

GOVERNMENT'S RESPONSE TO NORDIC CLINICAL'S MOTION FOR RETURN OF PROPERTY PURSUANT TO FED. R. CRIM. P. 41(g) - 1

claims of Nordic are incorrect, the motion should be denied.

The Court should not provide the relief requested by Nordic for two reasons: first, because Nordic does not set forth facts that would support the Court's exercise of equitable jurisdiction, and second, because the unapproved new drugs and misbranded drugs that are contraband as well as evidence and instrumentalities in an ongoing criminal investigation cannot be returned.  Likewise, under the equitable doctrine of Unclean Hands, the court should not return unmerchantable goods that were illegally introduced into interstate commerce.

**FACTUAL BACKGROUND**

On September 26, 2017, government agents executed a criminal search warrant at the premises of Specialty Fulfillment Center (DBA AC Fillers), 3 17th St. S., Nampa, ID.  The search warrant affidavit, which was filed under seal, established probable cause to believe that evidence, instrumentalities, and records relating to violations of 21 U.S.C § 331 of the federal Food, Drug, and Cosmetic Act (FDCA) would be found at the premises.  The warrant, issued by this Court, authorized the executing agents to seize, among other things:

> Evidence, instrumentalities and records relating to violations of 21 U.S.C. § 331 and 18 U.S.C. § 371; involving the Specialty Fulfillment Center and occurring after November 1, 2016, including:
>
> a. The following products:
>     1. Any adulterated and/or Misbranded medical devices labeled as "Acquafiller" and "Nordic Clinical " dermal fillers, as well as any other misbranded and/or adulterated medical devices;
>     2. All unapproved new drugs, including but not limited to products labeled as botulinum toxin or similar, intended for injection into humans;
>
> b. All records and information . . . .

Exhibit A, ECF No. 4-3, p. 6-10.

During the execution of the warrant, law enforcement officers seized, among

GOVERNMENT'S RESPONSE TO NORDIC CLINICAL'S MOTION FOR RETURN OF PROPERTY PURSUANT TO FED. R. CRIM. P. 41(g) - 2

other things, approximately 3500 bottles of various products labeled as "dietary supplements" and approximately 2800 packages of products labeled as "Actaflex" pain creams. *Id.* at p. 4-6. It is these products, labeling for various Nordic products, and two folders labeled "Nordic" that are the subject of Nordic's Motion. ECF No. 4-1, p. 2-3.

## ARGUMENT

In this case, not only do the balance of equities weigh in favor of the Government, but the nature of the products—unapproved new drugs and misbranded drugs shipped in interstate commerce—would bar their return altogether.

The movant does not set forth facts sufficient for the Court to exercise its equitable jurisdiction and reach the merits of the motion. Under Federal Rule of Criminal Procedure 41(g), "A person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return." When there are no criminal proceedings pending against the movant, Rule 41(g) motions are treated as civil proceedings invoking the court's equitable powers. *Ramsden v. U.S.*, 2 F.3d 322, 324 (9th Cir. 1993). [1] The *Ramsden* court articulated four factors a court should consider in determining whether to entertain a Rule 41(g) motion made prior to initiation of criminal proceedings:

(1) whether the Government displayed a callous disregard for the constitutional rights of the movant;
(2) whether the movant has an individual interest in and need for the property he wants returned;
(3) whether the movant would be irreparably injured by denying return of the property; and
(4) whether the movant has an adequate remedy at law for the redress of his grievance.

*Id.* at 325. No single factor is determinative. "If the 'balance of equities tilts in favor of reaching

---

[1] At the time *Ramsden* was decided, Rule 41(e) governed return of property seized during a search warrant. *Ramsden*, 2 F.3d 322, n. 1.

GOVERNMENT'S RESPONSE TO NORDIC CLINICAL'S MOTION FOR RETURN OF PROPERTY PURSUANT TO FED. R. CRIM. P. 41(g) - 3

the merits' of the Rule 41(g) motion, the district court should exercise its equitable jurisdiction to entertain the motion. *United States v. Kama*, 394 F.3d 1236, 1238 (9th Cir. 2005) (quoting *Ramsden*, 2 F.3d at 326.).

However, even if a court might otherwise entertain a motion under Rule 41(g), the motion must be denied "if the defendant is not entitled to lawful possession of the seized property, the property is contraband or subject to forfeiture, or the government's need for the property as evidence continues." *United States v. Van Cauwenberghe,* 934 F.2d 1048, 1061 (9th Cir. 1991). If the court reaches the merits of "a motion for return of property [that] is made before an indictment is filed (but a criminal investigation is pending), the movant bears the burden of proving both that the seizure was illegal and that he or she is entitled to lawful possession of the property." *United States v. Martinson*, 809 F.2d 1364, 1369 (9th Cir. 1987). Nordic fails to meet either burden.

## I. The products at issue were properly seized, and the *Ramsden* Factors Weigh in Favor of the Government.

### a. The warrant authorized the seizure of the relevant products.

The Government did not display a callous disregard for Nordic's constitutional rights when it seized property in accordance with a lawfully obtained search warrant. Instead, the Government obtained and executed a valid search warrant at Specialty Fulfillment Center, 3 17th St. S., Nampa, ID, on September 26, 2017.

Attachment B of the search warrant sets forth property to be seized and begins with: "1. Evidence, instrumentalities and records relating to violations of 21 U.S.C. § 331 and 18 U.S.C. § 371. . . ." Exhibit A, ECF No. 4-3. Subsection 1(a) identifies certain products, relevant to the allegation in this motion, including: "All unapproved new drugs, including but not limited to products labeled as botulinum toxin or similar, intended for injection into humans." *Id.* The

GOVERNMENT'S RESPONSE TO NORDIC CLINICAL'S MOTION FOR RETURN OF PROPERTY PURSUANT TO FED. R. CRIM. P. 41(g) - 4

property to be seized by Attachment B was not specifically limited to items meant for injection or drugs only labeled as botulinum toxin.  In fact, Attachment B was a non-exhaustive list over four pages describing property to be seized.  That includes items such as "transportation and shipping records" and "invoices," among many other items.  *Id.*

The Neurocet, Blood Boost, ActaFLEX4x, labeling and inserts, and two folders of documents were properly seized.  The three products—Neurocet, Blood Boost, and ActaFLEX4—are the focus of Nordic's motion.  As will be discussed below, those three products are all unapproved new drugs and misbranded drugs, and thus, are plainly evidence and instrumentalities relating to violations of 21 U.S.C. §331.

In addition, a plain view reading of the labeling would have alerted investigators that the products and, kits and inserts, and documentation, were within the scope of the warrant because they were unapproved new drugs.  Information available on the Nordic website describes, for example, ActaFLEX4x as a product which relieves and mitigates symptoms of bodily pains to include arthritis of the fingers, hips, knees, shoulders and wrists, as well as to treat "bursitis" and "tendonitis" using a "unique transdermal delivery" via a "cetylated fatty acid complex."  *See* Exhibit 1-3, p.7-10.  For the relevant time period, Nordic was not registered as a drug establishment; nor, for example, is ActaFLEX4x listed as a product by a registered drug manufacturer.  *See, e.g.* Exhibit 2.  A plain view of the product, would have identified the product as an unapproved new drug—bringing the property squarely within the bounds of the search warrant.[2]

---

[2] Arguments that the prosecutor involved in the case in any way acquiesced to allegations that the seized property was obtained unlawfully are inappropriate.  As counsel is aware, the government is foreclosed from sharing or disclosing certain information; for example, the provisions of Local Criminal Rule 49.1 and Federal Rule of Criminal Procedure 6(e). *See* Exhibit D, ECF No. 4-6.

GOVERNMENT'S RESPONSE TO NORDIC CLINICAL'S MOTION FOR RETURN OF PROPERTY PURSUANT TO FED. R. CRIM. P. 41(g) - 5

**b.  The movant does not have an individual interest in and need for the property that is the subject of the motion.**

Nordic claims it has an individual interest in the property it seeks to have returned.  This analysis is somewhat complicated by the fact that some of the labeling reads: "Distributed by: Nordic Clinical, #3 17th Ave. South, Nampa, ID 83651."  *See e.g.,* Exhibit 1-1, p. 13 and Exhibit 1-3, p. 12.  The movant does not, however, make any assertions that the Specialty Fulfillment Center and Nordic Clinical are the same business.

Even assuming Nordic can show an individual interest in the property it seeks, it does not have a legitimate need for the property.  Nordic sells the products at issue through its website at www.nordicclinical.com and claims that it will lose sales of approximately $259,000 and additional losses from expired products. [3]  ECF No. 4-2, p. 2.  Nordic argues that the products it seeks are "essential to its business."  ECF No.4-1, p.9.  The pleadings and affidavit make it clear that Nordic's intent and need for the property is for sales, but the property is unmerchantable.

Neurocet, Blood Boost, and ActaFlex4X are unapproved new drugs and misbranded drugs, as further discussed below.  *See* Exhibits 1, 2.  Federal law prohibits: the introduction into interstate commerce misbranded drugs (21 U.S.C. § 331(a)); and receiving misbranded drugs in interstate commerce, and the delivery or proffered delivery thereof for pay or otherwise (21 U.S.C. § 331(c)).  Nordic identifies one need for the property that is the subject of the motion— to sell it—and that is prohibited.

For the items identified as Item #29-2 folders Nordic and Item#35-Receiving Invoices for

---

[3] The alleged loss amount is unsupported. There is no calculation or documentation to show how the number was reached, if it is based on gross revenue, and why that would be an appropriate figure. In addition, there is no information provided regarding the actual cost of the products to manufacture or the wholesale value. The Government cites the alleged loss amount as evidence of Nordic's intent to sell unapproved new drugs and misbranded drugs.

Nordic Clinical, that property was lawfully seized pursuant to 1(b) and (c) of Attachment B.  *See* ECF No. 4-3, p. 6-7.  Nordic does not assert it owns Specialty Fulfillment Center.  Therefore, the documents at issue are the business records of a third party, and Nordic does not have an individual interest or need for the property.

### c.  The movant would not be irreparably injured by denying the motion to return property.

The property at issue is not merchantable.  The property that is the subject of the motion has no value as unapproved new and misbranded drugs, as set forth below in detail.  As such, the issue of potential expiration fails because the products cannot be sold.[4]  Nordic has not alleged any other irreparable injury.  Also, the items seized are not unique.  They are primarily products and labeling.  The Government did not seize property that would prevent Nordic's business from functioning, such as, production lines, buildings, wholesale ingredients, or computers.  Nordic has failed to show irreparable injury if its Motion is denied.

### d.  The movant has an adequate remedy at law for the redress of his grievance.

As there have not been any criminal proceedings filed, it appears that this is the appropriate remedy at law for Nordic to obtain its property. The Motion, however, may be premature.  The Government has an evidentiary need for the property Nordic seeks.  The property is evidence and instrumentality in an ongoing criminal investigation.  It was lawfully seized on September 26, 2017, and Nordic filed its motion on November 16, 2017—less than two months after the property was seized.

---

[4] For two of the products, Nordic provides reports entitled "Certificate of Analysis."  At the top of the certificates is information it appears was taken from a label such as the products such as code number, product, manufacture date, and an expiration date approximately two years from the manufacture date.  Vitaquest Certificates, Exhibit E, ECF No. 4-7.  There is no certificate for ActaFLEX4x or other evidence supporting an expiration claim.

GOVERNMENT'S RESPONSE TO NORDIC CLINICAL'S MOTION FOR RETURN OF PROPERTY PURSUANT TO FED. R. CRIM. P. 41(g) - 7

As the *Ramsden* factors weigh in favor of the Government, the Court should decline to exercise jurisdiction over this motion.  If the Court finds that it has jurisdiction over the motion, the Government asks that the motion be denied because the property cannot be returned.

**II.     The drugs at issue are unapproved new drugs and misbranded drugs and are not subject to return.**

Nordic's Motion makes two erroneous representations about the products it wants returned.  First, they represent that Neurocet and Blood Boost are "dietary supplements," providing a list of ingredients in support of this conclusory statement.  Second, while they admit that ActaFLEX4x is a drug, they also claim it is lawfully "distributed under the FDA's Tentative Final Monograph," again providing a list of ingredients in apparent support of the statement.  *See* ECF No. 4-1, p.7-8.  Neither representation is correct.  Instead, all the products are unapproved new drugs, and misbranded drugs.

**a.   The drugs are unapproved new drugs and misbranded Drugs.**

At the outset, an overview of the legal framework applicable to all the products at issue is helpful.

Under the federal Food, Drug, and Cosmetic Act (FDCA), "drugs" are defined as, among other things, articles intended for use in the cure, mitigation, treatment, or prevention of disease in man or other animals (21 U.S.C. § 321(g)(a)(B)); articles (other than food) intended to affect the structure or function of the body of man or other animals (21 U.S.C. § 321(g)(1)(C)); or articles intended for use as components of other drugs (21 U.S.C. § 321(g)(1)(D)).  Thus, a product is a "drug" not because of its ingredients, but what it is intended to be used for (although the ingredients may help establish the intended use).

Under the FDCA, a "new drug" is defined as any drug, "the composition of which is such that such drug is not generally recognized among experts qualified by scientific training and

GOVERNMENT'S RESPONSE TO NORDIC CLINICAL'S MOTION FOR RETURN OF PROPERTY PURSUANT TO FED. R. CRIM. P. 41(g) - 8

experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under

the conditions prescribed, recommended, or suggested in the labeling thereof . . . ."  21 U.S.C. §

321(p).  By law, a manufacturer must obtain FDA approval of a new drug application ("NDA")

or an abbreviated new drug application ("ANDA") for each new drug before it may legally be

introduced into interstate commerce.  21 U.S.C. § 355(a).  The introduction of an unapproved

new drug into interstate commerce is prohibited by 21 U.S.C. § 331(d).

     In order for a drug to be generally recognized as safe and effective (GRASE) under

particular conditions of use, and thus not a "new drug," the drug must satisfy three criteria:

> 1.     The specific drug product must have been subjected to adequate and well-
> controlled clinical investigations that establish the product as safe and effective under the
> proposed conditions of use.
> 2.     Those investigations must have been published in the scientific literature available
> to qualified experts.
> 3.     Qualified experts must generally agree, based on those published studies, that the
> product is safe and effective under its proposed conditions of use.

*See Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 629-634 (1973); *United*

*States v. Rutherford*, 442 U.S. 544 (1979).

     Under the FDCA, "dietary supplement" means a product (other than tobacco)

> 1)  intended to supplement the diet that bears or contains one or more of the
> following dietary ingredients:
>> a.  a vitamin;
>> b.  a mineral;
>> c.  an herb or other botanical; an amino acid;
>> d.  a dietary substance for use by man to supplement the diet by
>> increasing the total dietary intake; or
>> e.   a concentrate, metabolite, constituent, extract, or combination of any
>> ingredient described above; AND
> 2)  Is intended for ingestion, AND
> 3)  Is labeled as a dietary supplement.

21 U.S.C. § 321(ff).

     However, a product that might otherwise meet the definition of a "dietary supplement" is

GOVERNMENT'S RESPONSE TO NORDIC CLINICAL'S MOTION FOR RETURN OF
PROPERTY PURSUANT TO FED. R. CRIM. P. 41(g) - 9

a drug –and regulated as a drug, not a dietary supplement--if it meets the drug definition in 21

U.S.C. § 321(g).[5]  Under the FDCA, the "intended use" of a product is the ultimate key to

determining into which category that product falls, and how it is regulated by FDA.

"Intended Use" means the objective intent of the persons legally responsible for the

labeling of that article. The intent is determined by such persons' expressions, or can be shown

by the circumstances surrounding the distribution of the article, such as labeling claims;

advertising matter; oral or written statements by such persons or their representatives; or

circumstances that the article was, with the knowledge of such persons or their representatives,

offered and used for a purpose for which it was neither labeled nor advertised.  21 C.F.R §

201.128.  Thus, if an ingestible product, labeled a "dietary supplement," is intended by its

distributor to cure, mitigate, treat or prevent disease in man, it is a drug—even if the product

labeling also includes disclaimers about the intent to cure, mitigate, treat, or prevent disease.

*Church of Scientology v. Richardson*, 437 F.2d 214 (9th Cir. 1971) ("Furthermore, labels of

disclaimer are not controlling, but are to be considered together with any extrinsic evidence of

the device's intended use (e. g. publications, advertisements, etc.)" (citing *Alberty Food Prod's v.*

*United States,* 194 F.2d 463 (9th Cir. 1952)).

Also under the FDCA, "label" means a display of written, printed, or graphic matter upon

the immediate container of any article.  21 U.S.C. § 321(k).  The term "labeling" is defined more

broadly as all labels and other printed or graphic matter upon any article or any of its containers

or wrappers, or accompanying such article.  21 U.S.C. § 321(m).  It is unnecessary for the matter

---

[5] Note that one of the definitions for "drug," says that "articles (_other than food_) intended to
affect the structure or function of the body of man" are drugs.  (21 U.S.C. § 321(g)(1)(C),
emphasis added).  Distributors of dietary supplements, which are a subset of food, are allowed to
make structure/function claims for their products under certain conditions.

GOVERNMENT'S RESPONSE TO NORDIC CLINICAL'S MOTION FOR RETURN OF
PROPERTY PURSUANT TO FED. R. CRIM. P. 41(g) - 10

to have been physically attached to the drug or to have been shipped at the same time or with the drug to constitute "labeling."  If such matter is provided as part of an integrated distribution program pertaining to a drug and explains the uses of the drug, then it "accompanies" the drug and constitutes "labeling."  *United States v. Kordel*, 335 U.S. 345 (1948); *United States v. Urbuteit*, 335 U.S. 355 (1948).  Indeed, information on a company's website from which the product is marketed or sold can constitute "labeling" if such information is provided as part of an integrated distribution program with respect to the drug.[6]

All manufacturers, foreign and domestic, of drugs intended for distribution in the United States are required to register their manufacturing establishments, and are required to annually list every drug that they manufacture in each facility.  21 U.S.C. §360(b), (i), and (j).  The failure of such persons to register or list is a crime.  21 U.S.C. §331(p).

Drugs are misbranded if, among other things: Its labeling is false or misleading in any particular; or If it was not manufactured, prepared, propagated, compounded or processed in a registered establishment under §360, or was not included in a list required by §360(j). 21 U.S.C. § 352(a) and (o).  The introduction into interstate commerce of misbranded drugs is a crime (21 U.S.C. § 331(a)), as is the receipt of misbranded drugs in interstate commerce, and the delivery or proffered delivery thereof for pay or otherwise (21 U.S.C. § 331(c)).

### i.  Neurocet

Nordic labels their product Neurocet as a "dietary supplement," and their Motion suggests that providing a list of ingredients for the product will establish that claim.  However, in this case, the ingredients are irrelevant to the determination of whether Neurocet meets the

---

[6] Websites associated with a manufacturer or distributor may also be the source of finding that entity's intended uses of their products.

GOVERNMENT'S RESPONSE TO NORDIC CLINICAL'S MOTION FOR RETURN OF PROPERTY PURSUANT TO FED. R. CRIM. P. 41(g) - 11

statutory definition of a "dietary supplement," because the objective intended uses of Neurocet include the cure, mitigation, treatment, or prevention of disease in man.  These intended uses make Neurocet a drug.

Evidence establishing that the intended use of Neurocet is to cure, mitigate, treat or prevent disease is abundant.  Among the claims for the product on its website, which constitutes labeling for Neurocet, even today are:

> Neurocet fights pain on three fronts for total body pain relief. First, it pumps up your brain's own endorphins, giving them 48 times the pain- relieving power of morphine. Second, it inhibits collagen breakdown for stronger joints. Third, it suppresses inflammation, which can cause heat pain and swelling. By suppressing this inflammation, Neurocet reduces pain and stiffness, which can be especially helpful for those suffering from arthritis.

> Neurocet helps get rid of pain all over your body! This includes, but is not limited to, pain such as: back pain, migraine headaches, joint pains, muscle aches, fibromyalgia, chronic pain, rheumatoid arthritis, osteoarthritis, whiplash, upper back pains, aching knuckles, premenstrual cramps and addictive withdrawal pain.

Exhibit 6.

Even more claims that Neurocet cures, mitigates, treats or prevents disease were in promotional flyers that were sent as part of Nordic's integrated marketing for Neurocet: "Neurocet blocks collagen breakdown and soothes inflammation" Additional claims such as, "Neurocet's APRESFLEX: Stops joint destruction by blocking collagen breakdown in your cartilage and connective tissues" and "Neurocet's Fruitex-B directly suppresses the inflammation that underlies most pain" are included.

There are no adequate and well-controlled clinical investigations of Neurocet for any purpose whatsoever that have been published in the scientific literature available to qualified experts.  *See* Exhibits 1, 1-1.  Therefore, Neurocet is both a drug and a new drug under the FDCA, and the statutes and regulations governing the marketing of drugs for sale in the United

States apply to this product.  Labeling this drug a "dietary supplement" is false and misleading.

A search of the FDA's drug approval databases reveal that Neurocet is not the subject of any of the kinds of new drug approvals described by 21 U.S.C. § 355.  *Id.*  Neither Nordic Clinical, Inc., nor the distribution center at 3 17th St. S., Nampa, ID is registered with FDA as a drug manufacturer.  *See* Exhibit 2.  Moreover, no drug establishment, foreign or domestic, has listed Neurocet as a drug it manufactures for sale in the United States.[7]  *Id.*

Based on the above analysis, Neurocet is an unapproved new drug, and is misbranded in that its labeling is false and misleading (21 U.S.C. § 352(a)), and it is manufactured in an unregistered drug establishment and is not listed by any registered drug manufacturer (21 U.S.C. § 352(o)).  The introduction into interstate commerce of Neurocet did, and would, violate 21 U.S.C. §§ 331(a) and (d).[8]

### ii. Blood Boost

Nordic also labels their "Blood Boost" product as a "dietary supplement," and again, their Motion seems to suggest that providing a list of "legal" ingredients in that product settles that issue.  However, as with the Neurocet product, the objective intended uses of "Blood Boost" are clearly the cure, mitigation, treatment, or prevention of disease in man.  These intended uses make "Blood Boost" a drug.

The immediate label on "Blood Boost" is benign enough.  But claims that this product cures, mitigates, treats, or prevent disease are quickly found in labeling and promotional material

---

[7] Under 21 U.S.C. §360(i)(1)(A)(i)), a foreign manufacturer of drugs to be imported into the United States, in addition to registering, must provide FDA with the name and address of its U.S. agent and the name of any known importer of the drug in the United States.

[8] Moreover, the receipt in interstate commerce of Neurocet by Specialty Fulfillment Center from Nordic Clinical, and the delivery or proffered delivery of those products to consumers for pay or otherwise, violated and would violate 21 U.S.C. §331(c).

for the product.  For example, on the website from which the product is sold even today is a link to where Nordic compares the product to FDA-approved drugs intended to treat erectile dysfunction:

> N-O Blood Boost works to restore nitric oxide levels in the body. Improving N-O availability often resolves erectile dysfunction. In fact, the popular erectile dysfunction drugs Viagra, Cialis and Levitra work on nitric oxide pathways to increase blood flow to the penis and substantially improve erections and sexual performance.[9]

Exhibit 6, p.2; *see also* Exhibit 6, p.1 (containing additional labeling).[10]

Even more blatant claims for treating medical conditions are made in a booklet that Nordic provides customers about Blood Boost.  One of which was mailed to a private citizen who provided it to law enforcement and it was given to an FDA Office of Criminal Investigation agent prior to the issuance of the search warrant.[11]  Exhibit 3.  The twenty-seven page booklet is replete with claims for the product (which constitutes labeling for Blood Boost): "The Cure for Disease as We Know It!" and "Kill bacteria and other dangerous organisms."  *Id.*  Blood Boost is also claimed to "Relax and Expand arteries" and also "Lowers blood pressure! Reduces coronary artery disease risk! Helps prevents hardening of the arteries!" *Id.*

These types of claims continue throughout the booklet.  "Fantastic for your blood pressure - your doctor will be STUNNED!" and "like magic—your blood vessels expand by 62 percent to boost circulation throughout your entire body (**Yes- 62 percent! It's clinically**

---

[9] https://support.nordicclinical.com/hc/en-us/articles/218210677-How-might-men-in-particular-benefit-from-N-O-Blood-Boost-

[10] https://support.nordicclinical.com/hc/en-us/articles/218210577-What-is-nitric-oxide-N-O-and-why-is-it-so-critical-to-human-health-

[11] Interestingly, the return address on this booklet was "Nordic Clinical, 4737 N. Ocean Drive #111, Fort Lauderdale, FL," which appears to be the business premises of "Pak Mail," a copying, mailbox rental, and shipping services business, as well as a "virtual office" business: https://www.opusvirtualoffices.com/virtual-office/florida/fort-lauderdale/location-16 .

GOVERNMENT'S RESPONSE TO NORDIC CLINICAL'S MOTION FOR RETURN OF PROPERTY PURSUANT TO FED. R. CRIM. P. 41(g) - 14

proven!").  *Id.* (emphasis in original).  These are only a few of the literally dozens of claims in the booklet regarding the intended use of Blood Boost to cure, mitigate, treat, and prevent a variety of diseases; clearly, it is a drug.

There are no adequate and well-controlled clinical investigations of Blood Boost for any purpose whatsoever that have been published in the scientific literature available to qualified experts.  *See* Exhibits 1, 1-2.  Therefore, it is also a new drug under the FDCA, the statutes and regulations governing the marketing of drugs for sale in the United States apply to this product.  Labeling this drug a "dietary supplement" is false and misleading.

A search of the FDA's drug approval databases reveal that Blood Boost is not the subject of any of the kinds of new drug approvals described by 21 U.S.C. § 355.  *Id.*  Neither Nordic Clinical, Inc., nor the distribution center at 3 17th St. S., Nampa, ID is registered with FDA as a drug manufacturer.  *See* Exhibit 2.  Moreover, no drug establishment, foreign or domestic, has listed Blood Boost as a drug it manufactures for sale in the United States.  *Id.*

Based on the above analysis, Blood Boost is an unapproved new drug, is misbranded in that its labeling is false and misleading (21 U.S.C. § 352(a)), and it is manufactured in an unregistered drug establishment and is not listed by any registered drug manufacturer (21 U.S.C. § 352(o)).  The introduction into interstate commerce of Blood Boost did, and would, violate 21 U.S.C. §§ 331(a) and (d).[12]

### iii.  ActaFLEX4x

Nordic's Motion represents that its topical drug ActaFLEX4x "…is otherwise distributed under the FDA's Tentative Final Monograph, 48 Fed Reg. 3852 (Feb. 8, 1983)," and thus a

---

[12] *See* footnote 8; the same §331(c) violation would apply to Specialty's shipments of Blood Boost.

lawfully marketed over-the-counter (OTC) drug.  ECF No.4-1, p.7.  However, ActaFLEX4x does not comport with the referenced Tentative Final Monograph (TFM).

The OTC Drug Review program was created by FDA in 1972 to facilitate the efficient review of hundreds of thousands of OTC drugs already on the market at that time. Rather than approve each individual product, as is done for prescription drugs and certain OTC drugs, the OTC Drug Review developed monographs for various therapeutic categories (e.g. external analgesics, cough/cold products).  The monographs established conditions, such as active ingredients, indications, dosage form and labeled directions, under which an OTC drug is generally recognized as safe and effective (GRASE).  An OTC drug that meets the specific conditions contained in a monograph is not required to be approved by FDA before marketing.

The OTC Drug Review was intended to be a three-step, public notice and comment rulemaking process.  As originally implemented, the process began with publication in the Federal Register of reports from an outside panel of experts.  These reports were published in Advance Notices of Proposed Rulemakings, or ANPRs. Public comments on these reports were submitted by the drug industry, by medical professionals, and by consumers – anyone with an interest in the topic of the report could submit comments.  FDA considered the reports, comments, any new data and information, revised the ANPR accordingly, and published the revisions as a proposed rule.  The proposed rule is also known as the TFM.

In response to the TFM, a second round of comments was received and evaluated. Following submission of comments to the TFM, the last step of the process was for FDA to analyze the comments and data that were submitted in response to the TFM, and to revise the monograph and publish it as a final rule.  Once published, the final monograph would contain the regulations that establish the conditions under which a category of OTC drugs is considered

GRASE.  The final monographs would then be published in the Code of Federal Regulations in Title 21, Food and Drugs.

Although some monographs in the OTC drug review were finalized using this three-step public notice and comment rulemaking process, for many other monographs, various issues have delayed the publishing of a final rule.  Thus, for more than 30 years, many categories of OTC products have remained covered by the TFM.  Pending a final monograph/rule, FDA generally does not object to the marketing of products that meet both the formulation and labeling required described in the TFM.  But for products which do not comport with a final monograph or TFM, the regulatory scheme for new drugs is applied.

Drug products intended for external (generally topical) analgesic indications such as the relief of pain are evaluated under the TFM for OTC External Analgesics (48 Federal Register (FR) 5852, February 8, 1983).  *See* 48 FR 5709, pp. 5852-69, Exhibit 4.

At first glance, ActaFLEX4x might appear to be within the TFM.  The immediate product label says that the active ingredient in ActaFLEX4x Pain Relief Cream is menthol 1.25%, which is a proposed acceptable ingredient in the TFM. The indications of use found on the product label are also included in the TFM.

However, as explained above, there is more to the *labeling* of ActaFLEX4x than just what appears on the immediate packaging, and here, that labeling removes ActaFLEX4x from the umbrella of the TFM.  Among those labeling issues: There are additional indications for use on Nordic's website that are not in the TFM, including treating "bursitis" and "tendonitis."  *See* Exhibit 1-3, p. 7.  The website also makes claims that the product has a "unique transdermal delivery," which is a novel dosage form that requires NDA approval (21 C.F.R. § 310.3(h)(5)) and is not covered under the TFM.  *See* Exhibit 1-3, p. 10.  The website says use of the product

has "cumulative benefits by using it over a 30-day period." *Id.* at p.9.  The TFM does not provide for any "cumulative" effects claims.

In addition, ActaFLEX4x is also outside the TFM, as well as being misbranded under 21 U.S.C. § 352(a), because while the Drug Facts lists "menthol 1.25%" as the sole active ingredient, the website labeling describes "cetylated fatty acid complex," a labeled inactive ingredient, in a role greater than its inactive purpose.  *Id.*; *see* 21 C.F.R. § 201.10(c)(4) ("The labeling of a drug may be misleading by reason (among other reasons) of: . . . The featuring in the labeling of inert or inactive ingredients in a manner that creates an impression of value greater than their true functional role in the formulation.")  Based on the labeling on Nordic's website beginning with the title "The ActaFLEX 4x Secret" (Exhibit 1-3, p. 9), "cetylated fatty acid complex" is intended as an active ingredient, defined at 21 CFR § 201.66(b)(2) as "any component that is intended to furnish pharmacological activity or other direct effect in the diagnosis, cure, mitigation, treatment, or prevention of disease, or to affect the structure or any function of the body of humans. The term includes those components that may undergo chemical change in the manufacture of the drug product and be present in the drug product in a modified form intended to furnish the specified activity or effect." Inclusion of "cetylated fatty acid complex" in this role also causes ActaFLEX4x to fall outside of the TFM; it is thus a new drug.

There are no adequate and well-controlled clinical investigations of ActaFLEX4x for any purpose whatsoever that have been published in the scientific literature available to qualified experts.  *See* Exhibit 1.

Since ActaFLEX4x is both a drug and a new drug under the FDCA, the statutes and regulations governing the marketing of drugs for sale in the United States apply to this product.

A search of the FDA's drug approval databases reveal that ActaFLEX4x is not the

GOVERNMENT'S RESPONSE TO NORDIC CLINICAL'S MOTION FOR RETURN OF PROPERTY PURSUANT TO FED. R. CRIM. P. 41(g) - 18

subject of any of the kinds of new drug approvals described by 21 U.S.C. § 355.  *Id.*  As previously noted, neither Nordic Clinical, Inc., nor the distribution center at 3 17th St. S., Nampa, ID is registered with FDA as a drug manufacturer.  *See* Exhibit 2.  Moreover, no drug establishment, foreign or domestic, has listed ActaFlex4x as a drug it manufactures for sale in the United States.  *Id.*

Based on the above analysis, ActaFLEX4x is an unapproved new drug, and is misbranded in that its labeling is false and misleading (21 U.S.C. § 352(a)), and it is manufactured in an unregistered drug establishment and is not listed by any registered drug manufacturer (21 U.S.C. § 352(o)).  The introduction into interstate commerce of ActaFLEX4x did, and would, violate 21 U.S.C. §§ 331(a) and (d).[13]

### b.  The drug products seized are not subject to return.

A Rule 41(g) motion should be denied "if the defendant is not entitled to lawful possession of the seized property, the property is contraband or subject to forfeiture, or the government's need for the property as evidence continues." *United States v. Van Cauwenberghe,* 934 F.2d 1048, 1061 (9th Cir. 1991).

### i.  The drug products seized are contraband.

A Motion for Return of Property under Rule 41(g) cannot be granted when the property in question is contraband, and should never be returned even to a rightful owner.  *United States v. Jeffers*, 342 U.S. 48 (1951).  *Trupiano v. United States*, 334 U.S. 699, 710 (1948); Fed. R. Crim. P. 41(g) (advisory committee note accompanying 1972 amendments: "the judge in the district of seizure does not have to decide the legality of the seizure in cases involving

---

[13] See footnote 8; the same §331(c) violation would apply to Specialty's shipments of ActaFLEX4x.

contraband which, even if seized illegally, is not to be returned."). The rule against returning contraband is so broad that it cannot be returned even if the seizure itself was unlawful. *Trupiano*, 334 U.S. at 710.

Contraband is "any property which is unlawful to produce or possess. Things and objects outlawed and subject to forfeiture and destruction upon seizure. . . . Goods exported from or imported into a country against its laws." BLACK'S LAW DICTIONARY, 322 (Sixth Edition, 1990). In *Bennis v. Michigan*, the dissent identified different types of contraband, pertinent to this matter is: "The first category—pure contraband—encompasses items such as adulterated food, sawed-off shotguns, narcotics, and smuggled goods. With respect to such "objects the possession of which, without more, constitutes a crime," the government has an obvious remedial interest in removing the items from private circulation, however blameless or unknowing their owners may be." *Bennis v. Michigan*, 516 U.S. 442, 459 (1996) (J. Stevens, dissenting) (citation omitted). *See also Myers v. Malone & Hyde*, 173 F.2d 291, 295 (8th Cir. 1949) ("But being misbranded [the canned tomatoes] were subject to confiscation by the United States and could not be legally held or sold by the buyer. They were contraband under the law of the United States, and as such were not merchantable.").

In this case, the products at issue— Neurocet, Blood Boost and ActaFLEX4x-- are unapproved new drugs and misbranded drugs, shipped in interstate commerce to Idaho in violation of 21 U.S.C. §§ 331(a) and (d), and proffered for sale from that location in violation of 21 U.S.C. § 331(c). Indeed, Nordic's own Motion admits that Nordic wants these drugs returned so that they can continue to introduce them into interstate commerce to fulfill customer orders, which would constitute further criminal acts.

### ii.  The property is evidence in an ongoing investigation.

Another factor for consideration in *Van Cauwenberghe* is whether government's need for the property continues. The government has had these products for approximately two months. At this time, the government seeks to maintain the lawfully seized property as it continues a criminal investigation.

### III.   Under the doctrine of unclean hands, the Court should not provide the relief requested by Nordic.

Because Nordic's Motion asks for equitable relief, all the principles of equity apply.  This doctrine "provides that a party to a lawsuit may not obtain the relief it seeks if it has engaged in wrongful conduct."  *Smith v. United States*, 293 F.3d 984, 988 (7th Cir. 2002). "[H]e who comes into equity must come with clean hands.  This maxim is far more than a mere banality. It is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks, however improper may have been the behavior of the defendant."  *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co*., 324 U.S. 806, 814 (1945).  *See also Adler v. Fed. Republic of Nigeria*, 219 F.3d 869, 877 (9th Cir.2000); *Danjaq LLC v. Sony Corp.,* 263 F.3d 942, 956 (9th Cir. 2001).

As demonstrated above, these drugs are contraband – misbranded and unapproved new drugs unlawfully shipped in interstate commerce.  Nordic asks the court to ignore the illegality of its business and the contraband nature of these goods, and simply return these unmerchantable drugs so they may continue their unlawful conduct.  "[E]quitable relief *will* be refused if it would give the plaintiff a wrongful gain." *Scheiber v. Dolby Laboratories, Inc.*, 293 F.3d 1014, 1021-22 (7th Cir., 2002, emphasis added).  A court should always "withhold an equitable remedy that would encourage, or reward (and thereby encourage), illegal activity."  *Shondel v. McDermott*, 775 F.2d 859, 868 (7th Cir. 1985).  "Public policy . . . makes it *obligatory* for courts to deny a

GOVERNMENT'S RESPONSE TO NORDIC CLINICAL'S MOTION FOR RETURN OF PROPERTY PURSUANT TO FED. R. CRIM. P. 41(g) - 21

plaintiff relief once his 'unclean hands' are established . . . ."  *Gaudiosi v. Mellon*,  269 F.2d 873,

881-82 (3d Cir. 1959), *cert. denied,* 361 U.S. 902 (1959) (emphasis added).

## CONCLUSION

The Court should deny the petition because the property that is the subject of the request

to return was lawfully seized pursuant to a search warrant, the *Ramsden* factors weigh in the

Government's favor, and the products are unapproved new drugs and misbranded drugs and

cannot be returned.  Likewise, under the equitable doctrine of unclean hands, this court should

deny Nordic this relief, since the very business it conducts is unlawful, and the product it

distributes cannot be legally sold.  For all the foregoing reasons, the United States respectfully

requests that the Court deny the Motion.

Respectfully submitted this 1st of December, 2017.


BART M. DAVIS
UNITED STATES ATTORNEY
By:


*/s/* _____
DARCI N. WARD
Assistant United States Attorney

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 1, 2017, the foregoing **GOVERNMENT'S**

**RESPONSE TO NORDIC CLINICAL'S MOTION FOR RETURN OF PROPERTY**

**PURSUANT TO FED. R. CRIM. P. 41(g)** was electronically filed with the Clerk of the Court

using the CM/ECF system, and that a copy was served on the following parties or counsel by:

| | |
|---|---|
| Scott McKay (ISB#4309)<br>NEVIN, BENJAMIN, McKAY & BARTLETT<br>303 West Bannock<br>Boise, Idaho 83701<br>Telephone: (208) 343-1000<br>smckay@nbmlaw.com<br><br>Andrew B. Lustigman<br>OLSHAN FROME WOLOSKY, LLP<br>1325 Avenue of the Americas<br>New York, New York 10019<br>Telephone: (212) 451-2300<br>alustigman@olshanlaw.com | ☐ United States Mail, postage prepaid<br>☐ Fax<br>☒ ECF filing<br>☐ E-mail |

_Darci N. Ward_